**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Lolmaugh, | No. CV-19-00365-TUC-EJM |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Jessica Lolmaugh brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Plaintiff raises three issues on appeal: 1) the Administrative Law Judge ("ALJ") erred by failing to evaluate the opinion of Dr. Francisco Valdivia; 2) The ALJ erred by giving inappropriate weight to the treating source statements of Dr. Young Min Song and Nurse Practitioner Mary Leon; and 3) the ALJ failed to provide clear and convincing reasons to discount Plaintiff's subjective symptom testimony. (Doc. 18).

Before the Court are Plaintiff's Opening Brief, Defendant's Response, and Plaintiff's Reply. (Docs. 18, 19, & 20). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. For the reasons stated below, the Court finds that this matter should be remanded for further administrative proceedings.

## I.    Procedural History

Plaintiff filed an application for Supplemental Security Income on April 6, 2016.

(Administrative Record ("AR") 63). Plaintiff alleged disability beginning on December 10, 2015 based on multiple sclerosis ("MS"), depression, and GERDS. *Id.*[1] Plaintiff's application was denied upon initial review (AR 62) and on reconsideration (AR 74). A hearing was held on February 7, 2018 (AR 33), after which ALJ Yasmin Elias found, at Step Five, that Plaintiff was not disabled because she was capable of making an adjustment to other work existing in significant numbers in the national economy. (AR 21–22). On June 6, 2019 the Appeals Council denied Plaintiff's request to review the ALJ's decision. (AR 1).

## II.    Factual History[2]

Plaintiff was born on January 18, 1989, making her 28 years old at the amended AOD of her disability. (AR 63). She has an 11th grade education and past work as a call center customer service representative. (AR 190).

### A.    Treating Physicians

On February 17, 2016 Plaintiff was seen at Marsh Family Medicine and reported loss of vision in her left eye/cloudiness, loss of fine motor skills, weakness in the right hand, and that she was losing her balance and felt like she was walking drunk. (AR 357–358). Her exam was normal and the plan was to refer her to a neurologist and ophthalmologist.

On February 18, 2016 Plaintiff saw Dr. Snow for evaluation of blurry black spots in her vision and reported decreased vision in the left eye and numbness in the left side of her mouth. (AR 348). Dr. Snow assessed optic neuritis, possible MS, and ordered an MRI.

A February 26, 2016 MRI of the orbits and head showed 1) enlargement with enhancement of the left optic nerve consistent with optic neuritis, and 2) multifocal signal abnormalities in the cerebellum and cerebral hemispheres consistent with MS; numerous enhancing lesions present suggesting active demyelination. (AR 303–304).

On March 9, 2016 Plaintiff was seen by Dr. Young Min Song at the Center for

---

[1] At the hearing before the ALJ, Plaintiff amended her AOD to April 6, 2016. (AR 14).
[2] While the undersigned has reviewed the entirety of the record in this matter, the following summary includes only the information most pertinent to Plaintiff's claims on appeal.

Neurosciences for optic neuritis and possible MS. (AR 316). She reported developing left optic neuritis in December 2015 causing blurry vision and loss of acuity, and in January 2016 developed vomiting, loss of balance, and numbness and tingling in the arms and legs. On exam Plaintiff had abnormal vision left eye, normal narrow based gait, and abnormal tandem walk. (AR 317). Dr. Song assessed MS, neuromyelitis optica, and optic neuritis, and prescribed acute large dose steroid therapy.

A March 23, 2016 MRI of the thoracic spine showed 1) vague increased T2 signal intensity within the spinal cord centered at inferior T10; this may represent a subtle demyelinating lesion; no evidence of associated cord swelling, atrophy, or enhancement, and 2) otherwise unremarkable MRI. (AR 307–308). An MRI of the cervical spine was unremarkable. (AR 319–320).

On March 25, 2016 Plaintiff had a follow-up with Dr. Song and reported depression and suicidal thoughts, morning nausea, and shortness of breath. (AR 313–314).

On April 4, 2016 Dr. Song noted that Plaintiff did well on steroid pulse therapy and they would start Gilenya. (AR 310).

On June 2, 2016 Plaintiff saw Dr. Song after doing a trial on Tecfidera; she had not started Gilenya because she had long QT syndrome. (AR 325). Plaintiff reported she only took Tecfidera for a few days because her right eye started getting blurry and feeling sore. (AR 325). On exam Plaintiff had new abnormal vision right eye, RAPD right, right optic nerve head swelling, and desaturation right. Dr. Song assessed right optic neuritis, not an adverse reaction to Tecfidera, and prescribed Solu-Medrol infusions for 3 days and resume Tecfidera.

A June 27, 2016 note from Dr. Song states:

> Jessica Lolmaugh is a patient of mine whom I have been treating for a recently diagnosed chronic condition. Her diagnosis does not allow her to participate in strenuous activity. In addition, her activities are limited and therefore, is unable to utilize a gym and its equipment due to her health and limited restrictions.

(AR 370).

- 3 -

On August 2, 2016 Plaintiff saw Dr. Song and her right eye was doing better after the Solu-Medrol infusion; she had been on Aubagio and was doing well. (AR 397). Plaintiff complained of leg pain, worse in the evening when resting, and she felt the urge to move. Plaintiff reported she was getting a lot of headaches and her body felt achy every day, especially at night, and sometimes her stomach hurt and she was nauseous from her medication. (AR 398). Dr. Song recommended Ropinirole for restless leg syndrome.

On September 26, 2016 Dr. Song completed an Attending Physician's Questionnaire on MS. (AR 386). Dr. Song documented that Plaintiff had been diagnosed with MS and had experienced a persistent disorganization of motor function; specifically, paresis or paralysis, and optic neuritis—blurry and loss of vision. Plaintiff experienced these disturbances in various combinations on a daily basis for an "unknown" length of time, with "unknown" periods of remission. Plaintiff also had permanent residual disturbances of body aches, tingling and numbness, loss of balance, and headaches. The disturbances affected her ability to ambulate but she did not need an assistive device. Dr. Song did not answer questions about how long Plaintiff could walk/stand or lift/carry, but stated that Plaintiff's disturbances affected her ability to handle because of tingling and numbness in her arms and hands. (AR 387).

On October 5, 2016 Plaintiff saw Dr. Song and complained of severe tingling, much worse on walking, and no change in strength; Ropinirole did not help and Gabapentin only worked for the first 3 days. (AR 394). Dr. Song assessed optic neuritis, good response to Solu-Medrol; MS, continue Aubagio; restless leg syndrome, continue Gabapentin; and leg pain, which Dr. Song noted she could not explain very well because Plaintiff did not have any new weakness, reflex or sensory changes, but Plaintiff complained of difficulty walking and inability to work because of headache, dizziness, leg pain, and difficulty walking, and Plaintiff cried during the visit and said she was denied for disability. (AR 395). Dr. Song recommended she increase Gabapentin.

A December 27, 2016 vision exam showed an abnormal exam compatible with bilateral optic neuritis. (AR 556).

On January 3, 2017 Plaintiff saw Dr. Valdivia at the Center for Neurosciences. (AR 557). They discussed that pregnancy was very important to her, but she would delay for at least 6 months to assess where her disease activity was at and monitor with MRIs. She did not tolerate Tecfidera and was not a candidate for Gilenya because of cardiac problems, so they would try Copaxone. Plaintiff wanted to exercise and was referred for PT.

On February 10, 2017 Plaintiff saw N.P. Niemi-Olson at the Center for Neurosciences for a follow-up after steroid infusion for MS relapse. (AR 540). Plaintiff reported she still had a headache and mood disturbances. She thought Gabapentin might be making her dizziness worse and wanted to try Lyrica instead and was given a sample and instructions to switch. Findings on exam were generally normal, but Plaintiff had to hold onto the counter for balance to tiptoe, heel walk, and tandem walk. (AR 541).

On July 13, 2017 Plaintiff saw Dr. Valdivia and was doing well with her MS on Gilenya, but still having headaches occurring daily. (AR 520). She wanted to stop Gilenya to get pregnant, but Dr. Valdivia wanted her to get an MRI first to make sure she was stable and did not have any new or active lesions. He also felt it was premature to stop Gilenya, but Plaintiff was very anxious to get pregnant. Findings on exam were normal, and Topamax was prescribed for headaches. (AR 520–521).

On August 18, 2017 Plaintiff saw Dr. Valdivia and was doing well on Gilenya and had no new symptoms or exacerbations, migraines were significantly improved with Topamax, and there was improvement in her brain MRI compared to the previous study. (AR 428). There was a new lesion over the left pericallosal periventricular white matter but there was no active inflammation. They had a long discussion regarding Plaintiff's desire to get pregnant and how her MS could affect pregnancy; Dr. Valdivia would follow her closely. Plaintiff was to stop Gilenya 2 months before pregnancy and Topamax 2 weeks before. Her exam was normal with good memory and fund of information, normal gait, no weakness, and examination of cranial nerves revealed full extraocular movements. (AR 429).

On September 6, 2017 Plaintiff saw N.P. Leon to discuss her disability paperwork

and reported she could not see out of her left eye, had 14 severe migraines a month, and had trouble walking due to pain and pins and needles and sometimes collapsed. (AR 513). On exam she had decreased range of motion of the neck and back and was unable to toe or heel walk. (AR 515). That same date, N.P. Leon completed a Physical Residual Functional Capacity Questionnaire. (AR 400).[3] Plaintiff's diagnoses were MS with vision loss, severe migraines, and myalgia, and her prognosis was fair; her symptoms included fatigue, dizziness, trouble seeing, migraines, and trouble walking. The form states that Plaintiff's pain or other symptoms would interfere with her attention and concentration constantly, that she needed to lie down or elevate her legs for more than 1.5 hours during the workday, that she could sit for 30 minutes, and that she could not walk or stand at all. Plaintiff needed to intermittently use a cane, and had to shift positions from sitting/standing/walking every 2 minutes. Plaintiff could use her hands/arms 90 percent of the workday for handling, 75 percent for fingering, and 50 percent for reaching. She needed to take 8 extra breaks a day and would be absent more than 4 days per month. (AR 401). Plaintiff also needed to avoid extreme temperatures, had trouble with her vision especially in the left, did not drive, always felt dizzy, her legs always hurt with pins and needles, and she had mobility issues and severe migraines.

On December 11, 2017 Plaintiff went to the ER with complaints of worsening body aches and dizziness, and a new onset of blurry vision and seeing dark spots. (AR 466). She was started on steroids and her vision improved.

On December 14, 2017 Plaintiff saw Dr. Valdivia for a follow-up from her ER visit. (AR 425). He reviewed the MRI and noted she had a new faint enhancing lesion indicating disease activity, and prescribed steroids. They decided to postpone disease-modifying therapies because Plaintiff still wanted to get pregnant. Her exam was generally normal, but she was hyperreflexic. (AR 427).

On December 20, 2017 Plaintiff was seen at Hodges Eye Care and said that when

_____
[3] This form contains two different handwritings. Evidently Plaintiff filled it out with N.P. Leon and wrote down her own symptoms and limitations and N.P. Leon signed it. (AR 291).

- 6 -

looking she saw a spot like she was looking at a light for a while; a doctor at the hospital told her she had a yellow spot when she looked left. (AR 451). The impression was conjunctiva-pinguecula and she was given blink gel for lubrication, and referred back to her neurologist for evaluation and treatment of optic neuritis. (AR 452). It was also recommended that she still be on steroids based on her exam findings, and Plaintiff said she was waiting for her insurance authorization.

On January 18, 2018 Plaintiff saw N.P. Niemi-Olson and reported no new neurologic symptoms but said that when she got hot, she sometimes had more pain in her legs, pins and needles, and vision changes. (AR 423). It was recommended that she go on disease modifying therapy while waiting to get pregnant, but Plaintiff did not want to. Findings on exam were generally normal except she could not tiptoe due to pain, but could heel walk and tandem walk without holding onto the counter. (AR 423–424).

On October 15, 2018 Plaintiff saw Dr. Valdivia and complained of blurry vision, especially in the left eye. (AR 30). Interpretation of her visual exam was "abnormal study compatible with severe, bilateral optic neuritis."

B.    Consulting Physicians

On August 6, 2016 Plaintiff saw Dr. Joseph Benach for a psychological evaluation. (AR 382). Plaintiff apologized for crying when answering questions, even though she was not observed to be imminently tearful, and crying did not appear to affect her tone of voice or overall mood. She reported that her MS affected her ability to live and her daily activities, and things had progressed to where it was hard to talk, see, drive, walk, and eat. When Dr. Benach noted that she was able to see him and walk appropriately, Plaintiff stated she could now because she was on medication. Plaintiff reported that she lived with her mother and was divorcing her husband because he could not handle her disease, and that she wanted someone to support her. (AR 383). Plaintiff's mental status exam was normal; her mood was congruent to affect, which ranged from superficially tearful to euthymic. Dr. Benach assessed a rule out diagnosis of malingering because Plaintiff "admitted interpersonal difficulties because she needs 'someone to support her.'" (AR

384). He further noted that "[t]here appears to be an external incentive to her current presentation; however, sufficient third party medical evidence is lacking to determine this." Dr. Benach opined that, "[f]rom a purely psychological perspective (including cognitive and activities of daily living), Ms. Lolmaugh's prognosis for participating in the workforce is very good. Her sustained concentration and persistence is considered good, as she does not struggle to maintain adequate understanding of directions for long durations." Dr. Benach also completed a Psychological/Psychiatric Medical Source Statement and opined that Plaintiff had no evidence of limitation in understanding and memory, sustained concentration and persistence, social interaction, or adaptation, and that she did not have a condition that would impose limitations for 12 months. (AR 381).

C.   Plaintiff's Testimony

On an undated Disability Report, Plaintiff stated that she was diagnosed with MS on March 9, 2016 and was unable to work; she could not drive because of vision loss in her left eye; she used a cane to help balance; and she could not write her own name. (AR 196).

On a Fatigue Questionnaire dated April 10, 2016 Plaintiff reported she was very tired, spent most of her day in bed watching movies, and napped 2–3 times a day. (AR 236). She could do dishes once a week but it took her an hour with lots of breaks. She was unable to even walk around the house without breaks, and would tune-out in mid-conversation because she cannot maintain eye contact and loses focus. (AR 237).

On a Function Report dated June 5, 2016 Plaintiff reported that she could not work due to loss of strength and minor mobility in her right arm/hand, loss of peripheral vision, impaired speech and comprehension, and balance issues. (AR 217). She had little to no activity throughout the day and could not drive, clean, cook, or workout, but had no problems with personal care. (AR 218–219). Her hobbies were watching tv; she used to dance and do makeup but no longer can because of fatigue, balance, and coordination. (AR 218). Plaintiff reported that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate,

- 8 -

understand, follow instructions, and use her hands. (AR 222). She could walk for 10–15 minutes then needed to rest for 5–10 minutes, could pay attention for 45 minutes, and did not follow instructions well. She used a cane during severe symptom flare-ups or walking long distances. (AR 223).

On an undated Disability Report–Appeal, Plaintiff reported that her infusion treatments caused more symptoms and limitations, and she had disabling dizziness, headaches, weakness, vision problems, and neuropathy pain, and severe fatigue. (AR 230). She did not have the energy to make it through a movie, and her husband left her because of her conditions. (AR 233).

On a Function Report dated October 4, 2016 Plaintiff reported that she could not work because she could not stay focused or remember procedures/tasks, could not sit or stand for very long, could not bend or stoop, and had to rest frequently. (AR 238). She spent her days in bed watching movies and napping, could not cook because of fatigue, dizziness, and getting easily overheated, and her only chore was helping with dishes. (AR 239–240). Plaintiff reported that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, remember, complete tasks, concentrate, follow instructions, and use her hands. (AR 243). She could walk 50–100 feet then needed to rest for 5–10 minutes, but sometimes as long as 1–3 hours.

On an undated Disability Report–Appeal, Plaintiff reported that she had difficulty with balance and walking, and with remembering processes and procedures. (AR 257). She had numbness and tingling in her upper extremities, and her communication was impaired by slurred speech.

At the hearing before the ALJ, Plaintiff testified that sometimes her condition was better than others. (AR 40). At her worst, she was extremely fatigued, saw black spots, and was unable to focus or concentrate because of her eyes and horrible migraines. She also had body pains, and her legs ached to the point where laying down, standing, or sitting didn't help. (AR 40–41). With her mobility, it's as if she's stumbling and drunk, and she feels like she can't grip anything with her hands. (AR 41). She has bad days a few times a

week; she stays in bed to prevent bad days because it's easier on her body that way.

Plaintiff sees spots in her vision a few times a week; she thinks it happens when she tries to do too much activity like go out of the house with her mom, and also when she is stressed or too hot, so she can't cook on the stove. (AR 42). She has a hard time concentrating to read or focus on a computer screen. (AR 43). When she gets tired, she will slur when she talks and has a hard time getting the words out., and sometimes can't complete a sentence. (AR 43–44). Plaintiff uses a cane that was not prescribed, but it helps guide her with walking because she gets dizzy. (AR 44). Her hands feel weak and tingly and she can't grip things. (AR 45).

Plaintiff stated she can sit for 15 minutes before she starts to get really uncomfortable, and she can stand for 15 minutes before needing to sit or lay down. (AR 45–46). She can walk for about 30 minutes with her cane. (AR 46). She does not do any housework because if she tries to push her limits, she is in extreme pain and it affects her sight. (AR 41). Going to the doctor's tires her out because taking a shower and getting dressed for an appointment is exhausting, and having the energy to talk to the doctor is exhausting. (AR 41–42). After an appointment she goes home and passes out. (AR 42).

Plaintiff does not take any medications on a regular basis, but does a steroid infusion that is supposed to help and protect her for about 3 months. (AR 47).

D.    Vocational Testimony

At the hearing before the ALJ, Erin Welsh testified as a vocational expert. (AR 48). She classified Plaintiff's past work as a retail sales clerk as light, her work as a telephone sales representative and customer service representative as sedentary, and her work as a caregiver as medium. (AR 50, 52).

The ALJ asked Welsh to assume an individual who could perform light work with the following limitations: sit for 6 hours, stand or walk for 6 hours, with the ability to alternate between the two without going off task, and work should not require more than frequent to occasional depth perception on the left side. (AR 53). Welsh testified that such an individual could do Plaintiff's past work as a customer service representative and would

be able to sit and/or stand occasionally to relieve symptoms as long as they stayed on task. (AR 54). Welsh further stated that such an individual could also do the jobs of merchandise marker and parking lot cashier. (AR 57).

For the second hypothetical, the ALJ asked Welsh to assume an individual who could perform sedentary work with the following limitations: occasionally climb, crawl, crouch, and kneel; avoid concentrated exposure to hazards; handle 90 percent of the time, finger 75 percent of the time, and reach 50 percent of the time. (AR 54). The ALJ clarified that handling and fingering were frequent, and reaching was occasional. (AR 55). Welsh testified that such a person could not perform the customer service work because it required frequent reaching. Welsh further stated that there was no other work at the sedentary level with only an occasional reach.

On questioning by Plaintiff's attorney, Welsh testified that if a person could only adjust the lens of their eye to bring an object into focus occasionally, such an individual could still do the jobs of customer service representative,  merchandise marker, and parking lot cashier. (AR 57–58). The jobs all required frequent near acuity and could not be maintained if near acuity was limited to occasional. (AR 59). Welsh further testified that the most time off task that would be permissible in the identified jobs was 10 percent, or 6 minutes per hour, and the jobs would not permit a person to lie down throughout the day.

E.    ALJ's Findings

The ALJ found that Plaintiff had the severe impairments of MS and optic neuritis. (AR 17). The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence of record for the reasons explained in the decision. (AR 18). The ALJ specifically noted the following: Although Plaintiff received treatment for her allegedly disabling optic neuritis, the record reveals that the treatment was generally successful in controlling her symptoms; optical examinations in 2017 reflect normal findings, which overall support intermittent mild ocular affect due to MS; Plaintiff

exhibits some positive objective findings, but the medical evidence demonstrates that the physical impairments are not disabling; as to Plaintiff's MS, the medical history is not fully consistent with the alleged severity of her symptoms and Plaintiff has not generally received the type of treatment one would expect from a totally disabled individual; at one point Plaintiff failed to follow treatment recommendations and requested to discontinue treatment to plan for pregnancy; despite the changes in treatment, Plaintiff reported no new neurological symptoms and N.P. Leon noted no positive findings; this demonstrates a possible unwillingness to do what is necessary to improve her condition, and may also indicate that Plaintiff's symptoms are not as severe as she purports. (AR 18–19).

The ALJ gave great weight to the state agency physician opinions at the initial and reconsideration levels because they are highly qualified experts in the Social Security Disability programs, they had the benefit of reviewing the treatment records that supported some limitations due to MS but overall generally mild diagnostic findings, and they adequately considered Plaintiff's subjective complaints. (AR 19).

The ALJ gave partial weight to the third-party function reports from Plaintiff's mother and husband and considered their statements in assessing Plaintiff's limitations, but found that their statements were not supportive of additional restrictions in the RFC because the medical evidence did not support their statements. (AR 20).

The ALJ assigned some weight to N.P. Leon's opinion because she had a treating relationship with Plaintiff, but the functional limitations assessed were much more restrictive that the evidence supports, including normal physical examinations and mild diagnostic and objective findings, and N.P. Leon did not provide an explanation or cite any medical evidence to support her assessment. (AR 20).

The ALJ gave little weight to Dr. Song's treating physician opinion because the opinion was without substantial support from any objective clinical or diagnostic findings, because the opinions were conclusory and provided very little explanation of the evidence relied on, and because Dr. Song did not opine any specific functional limitations. (AR 20).

Finally, the ALJ gave no weight to Dr. Benach's consulting psychological opinion

1  because he did not diagnose any impairments and did not opine that Plaintiff had mental

2  limitations that would last more than 12 months. (AR 20).

3    The ALJ found that Plaintiff had the RFC to perform light work with the following

4  limitations: sit for 6 hours in an 8-hour workday; stand/walk for 6 hours, with the ability to

5  alternate between the two without going off task; and the work should not require more

6  than frequent to occasional depth perception on the left side. (AR 17). The ALJ found that

7  Plaintiff had no past relevant work because her earnings were not at the level of substantial

8  gainful activity. (AR 21). The ALJ further found that Plaintiff could perform other work

9  existing in significant numbers in the national economy such as merchandise marker,

10 parking lot cashier, and customer service representative. (AR 21–22). The ALJ therefore

11 concluded Plaintiff was not disabled. (AR 22).

12   **III. Standard of Review**

13   The Commissioner employs a five-step sequential process to evaluate SSI and DIB

14 claims. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Heckler v. Campbell*, 461

15 U.S. 458, 460–462 (1983). To establish disability the claimant bears the burden of showing

16 she (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment

17 meets or equals the requirements of a listed impairment; and (4) the claimant's RFC

18 precludes her from performing her past work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

19 At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC

20 to perform other work that exists in substantial numbers in the national economy. *Hoopai*

21 *v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the

22 claimant "disabled" or "not disabled" at any point in the five-step process, she does not

23 proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

24   The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g),

25 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's

26 findings are based on legal error or are not supported by substantial evidence in the record

27 as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in

28 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by

substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Valentine*, 574 F.3d at 690 (internal quotations and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (citing *Shinseki v. Sanders*, 556 U.S. 396 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (internal quotations and citations omitted). Finally, "[a] claimant is not

1   entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how

2   egregious the ALJ's errors may be." *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135,

3   1138 (9th Cir. 2011).

4   **IV.   Discussion**

5         Plaintiff argues that the ALJ erred by failing to evaluate the opinion of Dr.

6   Valdivia—specifically, the motor vehicle division disability placard application that Dr.

7   Valdivia signed certifying that Plaintiff was permanently physically disabled. Plaintiff

8   further argues that the ALJ erred by discounting Dr. Song's and N.P. Leon's treating source

9   opinions, and by failing to give clear and convincing reasons to discount Plaintiff's

10  subjective symptom testimony. Plaintiff contends that these errors were harmful and

11  requests remand for reconsideration of the evidence.

12        The Commissioner argues that the ALJ was not required to discuss Plaintiff's

13  application for a disability parking placard, and that even if the ALJ did err, any error was

14  harmless because the statement was vague and conclusory and did not affect the ALJ's

15  non-disability determination. The Commissioner further argues that the ALJ's assessment

16  of the medical opinion evidence and Plaintiff's subjective symptom testimony is supported

17  by substantial evidence in the record, and that just because Plaintiff emphasizes an alternate

18  set of facts, that does not mean that the ALJ's decision is not supported by substantial

19  evidence.

20        The Court finds that the ALJ erred by failing to address Dr. Valdivia's opinion. This

21  error likely impacted the ALJ's assessment of the medical evidence of record and

22  Plaintiff's subjective symptom testimony, as well as the RFC assessment and the

23  hypotheticals posed to the VE, and thus the ultimate nondisability finding. Consequently,

24  the error was not harmless. Because questions remain regarding whether in fact Plaintiff

25  was disabled within the meaning of the SSA during the relevant time period, and because

26  Plaintiff's subjective symptom testimony is best reassessed in light of the record as a whole,

27  the Court finds that remand for further administrative proceedings is appropriate.[4]

28  _____
[4] Because the Court will remand this matter for further administrative proceedings on an open record, the Court declines to address the other issues raised by Plaintiff in her appeal.

A.   Evaluation of Medical Testimony

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 830). "Courts afford the medical opinions of treating physicians superior weight because these physicians are in a better position to know plaintiffs as individuals, and because the continuity of their treatment improves their ability to understand and assess an individual's medical concerns." *Potter v. Colvin*, 2015 WL 1966715, at *13 (N.D. Cal. Apr. 29, 2015). "While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Garrison*, 759 F.3d at 1012 (internal quotations and citations omitted). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's ADL. *Tommassetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). "An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating

his interpretation thereof, and making findings. The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* However, "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Finally, if the ALJ determines that the plaintiff's subjective complaints are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those subjective complaints. *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

B.   Analysis

Here, Plaintiff argues that the ALJ erred by failing to evaluate Dr. Valdivia's opinion. Dr. Valdivia did not complete an RFC assessment or medical source statement; the "opinion" in question is an Arizona MVD disability placard application.

On July 13, 2017 Dr. Valdivia signed Plaintiff's MVD disability placard application and checked the box indicating that Plaintiff was permanently physically disabled. (AR 266). The form states that in order to be physically disabled, the applicant must have one or more of the following conditions: unable to walk 200 feet without stopping to rest; unable to walk without help from another person or assistive device; lung disease; uses portable oxygen; cardiac condition; or severely limited in ability to walk due to an arthritic, neurological, or orthopedic condition. The form does not require, and Dr. Valdivia did not indicate, which of the listed conditions Plaintiff met.

Similar to the present case, in *Tindle v. Astrue*, 2012 WL 1842556, at *6 (D. Ariz. May 21, 2012), the claimant argued that the ALJ committed legal error because his failure to discuss a treating physician's treatment or opinions amounted to a rejection of those opinions without specific and legitimate reasons. In that case, the statements at issue were an opinion on a DES form that the claimant could not perform full-time employment, and the physician's approval of a disabled placard application based on his opinion that the claimant was severely limited in her ability to walk. This Court agreed with the claimant,

finding that the ALJ's failure to even mention the opinions constituted harmful error because the ALJ failed to substantiate his implicit rejection of the opinions by failing to address the doctor's opinions in the disability analysis. This Court further noted that because the doctor was a treating physician, the ALJ owed his opinion special deference.

Here, as in *Tindle*, the ALJ did not even mention Dr. Valdivia's opinions or treatment of Plaintiff. In addition to the disability placard application, Dr. Valdivia was one of Plaintiff's treating physicians at the Center for Neurosciences, yet the ALJ failed to mention his treatment of Plaintiff. The Court cannot meaningfully review the ALJ's decision when the ALJ fails to set forth his reasoning. While the Commissioner is not required to "discuss *all* evidence" the Commissioner is required to "make fairly detailed findings in support of administrative decisions to permit courts to review those decisions intelligently" and "must explain why significant probative evidence has been rejected." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. 1984) (emphasis in original) (internal quotations and citation omitted); *Garrison*, 759 F.3d at 1012–1013 ("When an ALJ does not explicitly reject a medical opinion or set forth specific legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion."). Thus, by failing to address the disability placard application or Dr. Valdivia's treatment notes, "[t]he ALJ necessarily failed to substantiate his implicit rejection of Dr. [Valdivia's] opinion that Plaintiff was . . . severely limited in her ability to walk[,]"[5] and was permanently physically disabled. *Tindle*, 2012 WL 1842556, at *6. Further, because Dr. Valdivia was a treating physician, the ALJ owed his opinion special deference. *Id.* Accordingly, the Court finds that "the ALJ's failure to set forth specific and legitimate reasons rejecting Dr. [Valdivia's] opinion was legal error." *Id.* (citing *Salvador*

---

[5] Although Dr. Valdivia did not indicate which of the listed conditions Plaintiff met, the Court agrees with Plaintiff that the only reason that makes sense in this context is that Plaintiff could not walk effectively.

- 18 -

*v. Sullivan*, 917 F.2d 13, 15 (9th Cir.1990) (finding that ALJ's implicit rejection of treating physician's opinion by concluding that claimant could perform light work, and ALJ's failure to evaluate the treating physician's findings or conclusions, was legal error) and *Kreisher v. Astrue*, 2011 WL 837147, * 4 (E.D. Cal. March 9, 2011) (finding that ALJ erred in failing to address treating physician's medical opinion and remanding for further proceedings)); *see also Marsh v. Colvin*, 792 F.3d 1170 (9th Cir. 2015) (finding harmful error where ALJ's decision failed to even mention treating doctor's opinion or notes).

The Court further finds that the cases the Commissioner cites in support of his argument are distinguishable. First, this Court acknowledges that in *Muro v. Colvin*, 2017 WL 629237, at *4 (D. Nev. Jan. 25, 2017), the court expressed skepticism that an MVD disability placard application constitutes a medical opinion.[6] However, in that case, the court noted that there was "no other mention of [the doctor who completed the form] in the entire administrative record, and as such, there is no other evidence supporting such a limitation." *Id.* The court further found that even if the MVD form was a medical opinion, "[c]ontrary findings within physicians' opinions, a lack of medical treatment for alleged medical impairments, and plaintiff's ability to perform at a higher functional level are specific and legitimate reasons to reject [the] opinion regarding walking limitations." *Id.* In contrast, in the present case, Dr. Valdivia *was* a treating physician and his treatment notes appear several times in the record. And, his finding on the MVD form that Plaintiff was unable to walk effectively is supported by Dr. Song's opinion that Plaintiff had persistent disorganization of motor function and loss of balance affecting her ability to ambulate (AR 386), and N.P. Leon's opinion that Plaintiff had trouble walking, could not stand or walk during an 8-hour workday, and intermittently needed a cane (AR 400), as well as Plaintiff's subjective complaints.

The case of *Papin v. Barnhart*, 221 F. App'x 540, 541 (9th Cir. 2007), is also distinguishable. There, the court found that the ALJ was not required to consider the

---

[6] "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

1    disability placard application completed by the treating physician because it was

2    conclusory and conflicted with the physician's later evaluation. However, in that case, the

3    ALJ summarized and specifically referenced the treating physician's records. Again, in the

4    present case, the ALJ never even mentioned Dr. Valdivia in her decision.

5        In *Perry v. Astrue*, 2011 WL 3903121, at *16 (N.D. Cal. Sept. 6, 2011), the court

6    found that the ALJ did not err in failing to consider the claimant's DMV disabled driver

7    certificate because "such evidence is not determinative on the issue of disability because

8    the DMV utilizes different criteria for issuing disabled placards which cannot be

9    interchanged with the guidelines set forth by the Social Security Administration." In that

10   case, it was not a treating physician's opinion that was at issue, but the fact that the claimant

11   had a disability placard. Further, in the present case, Plaintiff does not contend, nor does

12   the Court suggest, that Dr. Valdivia's certification on the disability placard application

13   constitutes a definitive opinion that Plaintiff is disabled—indeed, the determination or

14   decision of disability is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1);

15   *Batson*, 359 F.3d at 1195 (9th Cir.2004) ("[A] treating physician's opinion is . . . not

16   binding on an ALJ with respect to the . . . ultimate determination of disability."). Rather,

17   the ALJ's error here is that he wholly failed to mention Dr. Valdivia's treatment of Plaintiff,

18   including his opinion on the disability placard application.

19       Finally, in *Seiuli v. Astrue*, 2010 WL 1710361 (C.D. Cal. Apr. 26, 2010), the court

20   held that the ALJ did not err by failing to specifically discuss the fact that a physician

21   helped the claimant obtain a disabled placard from the DMV and that he put her on

22   disability for four months. In that case, the physician's chart note was almost two years old

23   when the ALJ rendered his decision that the claimant was not disabled, and, even accepting

24   as true the physician's opinion that the claimant was disabled and needed a DMV placard

25   for four months, it still would not have affected the ALJ's conclusion that the claimant was

26   not disabled almost two years later. Thus, *Seiuli* is clearly distinguishable from the facts

27   in the present case.

28       In sum, the Court finds that the ALJ erred by failing to provide clear and convincing

or specific and legitimate reasons supported by substantial evidence to implicitly reject Dr. Valdivia's opinion that Plaintiff was permanently disabled because she was unable to walk effectively. This error is not harmless because it affected the ALJ's assessment of the medical evidence of record and Plaintiff's subjective symptom testimony, as well as the RFC assessment and the hypotheticals posed to the VE, and thus the ultimate nondisability finding. *See Marsh v. Colvin*, 792 F.3d 1170, 1172–74 (9th Cir. 2015) ("a reviewing court cannot consider an error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."). Accordingly, the case must be remanded for further administrative proceedings, and the Court declines to reach Plaintiff's remaining arguments.

## V.    Remedy

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690.

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) (quoting *Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). Conversely, remand for an award of benefits is appropriate where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). "Even if those requirements are

met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021).

"[T]he required analysis centers on what the record evidence shows about the existence or non-existence of a disability." *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011). "Administrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence may well prove enlightening in light of the passage of time." *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014) (internal quotations and citations omitted). "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate." *Id.* "In evaluating [whether further administrative proceedings would be useful, the Court considers] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." *Id.* at 1103–04. "This requirement will not be satisfied if 'the record raises crucial questions as to the extent of [a claimant's] impairment given inconsistencies between his testimony and the medical evidence in the record,' because '[t]hese are exactly the sort of issues that should be remanded to the agency for further proceedings.'" *Brown-Hunter*, 806 F.3d at 495 (quoting *Treichler*, 775 F.3d at 1105).

Here, the Court finds that "[r]emand for further administrative proceedings is appropriate [because] enhancement of the record would be useful." *Benecke*, 379 F.3d at 593. The ALJ erred by wholly failing to address Dr. Valdivia's medical opinion and treatment of Plaintiff. It is thus unclear what effect the ALJ's consideration of the opinion would have on the ALJ's assessment of the other medical evidence of record, Plaintiff's RFC, or the hypotheticals posed to the VE. Consequently, issues remain regarding Plaintiff's RFC and her ability to perform work existing in significant numbers in the national economy during the relevant time period. *See Hill v. Astrue*, 698 F.3d 1153, 1162–63 (9th Cir. 2012). However, this Court offers no opinion as to whether Plaintiff is disabled

within the meaning of the Act. "The touchstone for an award of benefits is the existence of a disability, not the agency's legal error." *Brown-Hunter*, 806 F.3d at 495. Plaintiff's RFC and subjective symptom testimony are best reassessed in consideration of the entire record, and on remand the ALJ shall give further consideration to all of the previously submitted medical testimony and lay testimony and continue the sequential evaluation process to determine whether Plaintiff is in fact disabled. Additionally, the ALJ is required to consider all of Plaintiff's alleged impairments, whether severe or not, in the assessment on remand. SSR 86–8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations imposed by all of an individual's impairments, even those that are not 'severe.'"). "Viewing the record as a whole [this Court] conclude[s] that Claimant may be disabled. But, because the record also contains cause for serious doubt, [the Court] remand[s] . . . to the ALJ for further proceedings on an open record." *Burrell*, 775 F.3d at 1142. The Court expresses no view as to the appropriate result on remand.

## VI.   Conclusion

In light of the foregoing, **IT IS HEREBY ORDERED** that the Commissioner's decision is remanded back to an ALJ on an open record with instructions to issue a new decision regarding Plaintiff's eligibility for disability insurance benefits. The Clerk of Court shall enter judgment accordingly and close its file on this matter.

Dated this 22nd day of June, 2020.

_____

Eric J. Markovich
United States Magistrate Judge